IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

PAUL A. SMITH, et al.,                    )        CASE NO.  1:04 CV 13
                                          )
          Plaintiffs,                     )
                                          )
v.                                        )        JUDGE DONALD C. NUGENT
                                          )
SPRING HILL INTEGRATED                    )
LOGISTICS MANAGEMENT, INC.                )        MEMORANDUM OPINION
                                          )
          Defendant.                      )


This matter is before the Court on Defendant, Spring Hill Integrated Logistics

Management, Inc.'s Motion for Summary Judgment. (ECF # 30). Plaintiff, Paul Smith (in his

individual capacity, as executor of the estate of Heidi Smith, as administrator of the estate of

Hailey Smith, and as guardian of Austin Smith), filed suit against the Defendant claiming that

Spring Hill engaged in negligent behavior, aided and abetted violations of the Federal Motor

Carrier Safety Regulations, and is subject to liability under the "public franchise rules." Plaintiff

has also requested punitive damages. The issues have been fully briefed by both parties. Having

reviewed the briefs of the parties, and all applicable facts and law, this Court finds the

Defendant's motion well taken.  For the reasons set forth below, Defendant's Motion for

Summary Judgment is hereby GRANTED.

### Summary Judgment Standard

Summary judgment is appropriate when the court is satisfied "that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." FED. R. CIV. P. 56(c).  The burden of showing the absence of any such "genuine issue"

rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of
> informing the district court of the basis for its motion, and identifying those portions
> of 'the pleadings, depositions, answers to interrogatories, and admissions on file,
> together with affidavits, if any,' which it believes demonstrates the absence of a
> genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).  A fact is

"material" only if its resolution will affect the outcome of the lawsuit.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine"

requires consideration of the applicable evidentiary standards.  The court will view the summary

judgment motion in the light most favorable to the party opposing the motion.  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of their case.  Tolton v. American Biodyne, Inc., 48 F.3d

937, 941 (6th Cir. 1995) (citing Celotex, 477 U.S. at 322).  Accordingly, "[t]he mere existence of

a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff." Copeland v. Machulis, 57

F.3d 476, 479 (6th Cir. 1995) (citing Anderson, 477 U.S. at 252).  Moreover, if the evidence

-2-

presented is "merely colorable" and not "significantly probative," the court may decide the legal

issue and grant summary judgment. Anderson, 477 U.S. at 249-50 (citations omitted). In most

civil cases involving summary judgment, the court must decide "whether reasonable jurors could

find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." Id.

at 252. However, if the non-moving party faces a heightened burden of proof, such as clear and

convincing evidence, it must show that it can produce evidence which, if believed, will meet the

higher standard. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-

mover. The non-moving party may not simply rely on its pleadings, but must "produce evidence

that results in a conflict of material fact to be solved by a jury." Cox v. Kentucky Dep't of

Transp., 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this
> rule, an adverse party may not rest upon the mere allegations or denials of the
> adverse party's pleading, but the adverse party's response, by affidavits or as
> otherwise provided in this rule, must set forth specific facts showing that there is a
> genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as

an automatic grant of summary judgment, where otherwise appropriate. Id.

Though parties must produce evidence in support of and in opposition to a motion for

summary judgment, not all types of evidence are permissible. The Sixth Circuit has concurred

with the Ninth Circuit that "'it is well settled that only admissible evidence may be considered by

the trial court in ruling on a motion for summary judgment.'" Wiley v. United States, 20 F.3d

222, 225-26 (6th Cir. 1994) (quoting Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181

(9th Cir. 1988)). FED. R. CIV. P. 56(e) also has certain, more specific requirements:

-3-

> [Rule 56(e)] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit. Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

Wiley, 20 F.3d at 225-26 (citations omitted). However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

Id. at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." Anderson, 477 U.S. at 248. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. Id. at 249. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id.

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250.

-4-

## Facts[1]

The basic facts in this case are not in dispute. On June 22, 2000, Mr. Ashford fell asleep at the wheel of a semi-tractor trailer causing a multi-car accident. During that accident, he ran into a car occupied by Mrs. Heidi Smith, her daughter Hailey and her son Austin. Mrs. Smith and her daughter Hailey were killed.

Mr. Ashford was employed by Pro Drivers, a temporary truck driver leasing company. Pro Drivers leased Mr. Ashford to Chieftain as a temporary driver. Chieftain is an independent contractor hired by Spring Hill Integrated Logistics Management, Inc. ("Spring Hill") as a motor carrier for various routes established by Spring Hill for its customers. As part of its contract with Spring Hill, Chieftain was to hire, train, review, and assign drivers to various routes, and to monitor the drivers and deliveries. At the time Chieftain was hired, and at the time of the accident, it properly maintained its licenses, permits, certifications, insurance coverage and the DOT rating.

Spring Hill is a company that provides logistics management services, including designing delivery routes and hiring motor carriers for other companies. In this instance, Spring Hill was hired by Saturn to achieve "just in time" delivery for its parts and materials. "Just in time" delivery involves setting a specific scheduled time for delivery of materials and parts at a time when the parts are actually needed for assembly. This method eliminates the need for storing materials and parts prior to use, and saves companies the cost of storage and retrieval.

---

[1]  Unless otherwise stated, the facts as presented have been taken from Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment and from deposition testimony. Where there is disputed testimony, the facts have been viewed in the light most favorable to the Plaintiff, the non-moving party.

Spring Hill was hired to design delivery routes and to hire service providers, including motor carriers who provide trucks and drivers for deliveries. Spring Hill designed delivery route 240E which took drivers from Spring Hill, Tennessee, where they picked up a load of empty racks, to Cleveland, Ohio, where they exchanged the empty racks for new parts, and back to Spring Hill, Tennessee where they delivered the new parts to Saturn. This route was run every weekday evening. The contract between Chieftain and Spring Hill requires that there be two drivers in each truck. On the day of the accident, Mr. Ashford was teamed up with Mr. Mobley.

The trip from Spring Hill to Cleveland takes approximately ten to eleven hours.(Mobley Depo. at 31-33).   The route, as communicated to the drivers that night allowed for twelve hours of travel time.[2] (Ashford Dep. at 47- 48). Spring Hill builds in an extra time cushion for the final delivery to Saturn. This cushion is not communicated to the drivers.

Mr. Ashford and Mr. Mobley both indicated that they had heard that there have been issues with other drivers being late on this route. (Ashford Depo. at 107; Mobley Depo. at 51). However, both drivers testified that they believed the schedule left them plenty of time to meet their scheduled arrival time. (Ashford Depo. at 47-48, 108; Mobley Depo. at 48-50). There is no evidence that Spring Hill was aware of any issues with the timing of the route, or that they received any complaints from Chieftain, Saturn, or any of the suppliers regarding the timing of the route. Route 240E had a 98 percent on time rate at the time of the accident, and had maintained a 100 percent on time up until the year before the accident. (Turner Depo. at 82).

---

[2]     Plaintiff indicates that the route established a departure from Spring Hill at 8:30 p.m. CDT, and a Cleveland arrival time of 7:30 a.m. CDT, but the drivers both testified in their depositions that their scheduled departure from Spring Hill was 8:00 p.m. with an expected arrival time in Cleveland of 8:00 a.m. CDT.

-6-

On the day of the accident, the drivers left an hour later than scheduled. (Ashford Depo. at 109). Mr. Mobley drove the first five hours, leaving Mr. Ashford time to rest or sleep. Mr. Ashford was not able to fall asleep that night, however. After five hours, the drivers switched places and Mr. Mobley went to sleep while Mr. Ashford drove. Both drivers knew that if they were tired they were supposed to pull off the road and rest or wake the other driver and switch places. (Ashford Depo. at 66, 75, 99; Mobley Depo. at 85, 100). Mr. Mobley specifically told Mr. Ashford to wake him up to switch places if he got tired. (Mobley Depo. at 83-84). Mr. Ashford testified that he recognized he was tired, that he stopped and took a break, and then when he was still tired tried to wake Mr. Mobley by calling to him, but that he didn't try very hard. (Ashford Depo. at 70-77). Mr. Ashford did not tell anyone that he was feeling tired. He would not have faced any disciplinary action if he had taken time to rest, even if it had meant being late for his scheduled delivery.

## Analysis

Mr. Smith filed suit against Spring Hill in the Cuyahoga County Court of Common Pleas in November of 2003. (ECF #1, Attach. 1). The case was removed to this court on diversity grounds in January of 2004. (ECF #1). The Complaint sets forth eight counts. Counts One through Five allege negligent or reckless management of drivers and carriers, as well as negligent or reckless design and implementation of the delivery schedule; Count Two charges Spring Hill with aiding and abetting violations of the Federal Motor Carrier Safety Regulations ("FMCSR");[3]

---

[3]     Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment does not
        argue any separate claim for aiding and abetting. The issue of aiding and abetting is raised only as
        a possible exception to the general rule that parties are not responsible for the negligent acts of

Count Six alleges direct violations of the FMCSR; Count Seven alleges a violation of the public franchise rules; and Count Eight makes a claim for punitive damages.

### A. Negligent or Reckless Management of Drivers and Carriers

Generally speaking, Spring Hill cannot be held responsible for the negligent actions of Chieftain, its employees, or its subcontractors. It is undisputed that Chieftain is an independent contractor. It is also undisputed that Chieftain was wholly responsible for providing trained drivers to fulfill various routes designed by Spring Hill. An employer of an independent contractor is generally not liable for the negligent acts of the contractor or of his servants. Pusey v. Bator, 94 Ohio St. 3d 275, 278-279 (2002).

Ohio recognizes three exceptions to this general rule. First, an employer may be liable for injuries resulting from its own negligence in selecting or training an independent contractor. Albain v. Flower Hospital, 50 Ohio St. 3d 251, 258 (1990). Second, an employer may be held vicariously liable for the negligence of an independent contractor performing non-delegable duties imposed on the employer by statute, contract, franchise or charter, or arising from inherently dangerous work. Id. This exception subsumes the "public franchise" theory posited by the Plaintiff. Third, an employer may be held vicariously liable for the negligence of an independent contractor under the doctrine of agency by estoppel. Id.; Rubbo v. Hughes Provision Co., 138 Ohio St. 178 (1941).

#### 1. Negligent hiring and training

There is absolutely no evidence that Spring Hill was negligent in hiring Chieftain to

---

independent contractors. Therefore, any separate claim of aiding and abetting that may have been raised in the Complaint shall be deemed to have been abandoned, and this issue will be addressed only as a possible exception to the independent contractor rule.

provide trucks and drivers for the 240 E route. In fact, the Plaintiff appears to have abandoned this theory of liability in its Memorandum in Opposition to Defendant's Motion for Summary Judgment. Plaintiff's own purported expert testified that it was reasonable for Spring Hill to have hired Chieftain to operate as the motor carrier on this route. (Daecher Depo. a t155-156). Chieftain was duly licensed, certified and qualified to provide motor carrier services as required by Spring Hill. Chieftain maintained a "Satisfactory"safety rating (the highest available); carried all necessary insurance coverage; and its driver hiring and training processes had been certified by an independent organization. (Turner Aff. at ¶ 2a-e). Therefore, this exception to the general rule does not apply to the facts of this case.

2. Non-delegable duties and inherently dangerous work

This exception does not apply under the circumstances of this case. First, Spring Hill was not engaged in inherently dangerous work. The design of delivery routes is hardly considered an inherently dangerous job. Further, in so far as the Plaintiff may argue that Spring Hill should be liable as a motor carrier, Ohio law has held that, as a matter of law, the operation of commercial motor vehicles is not an "inherently dangerous" activity. George v. James Fry Trucking, 1982 Ohio App. LEXIS 11552, at *6 (Lucas Cty., June 11, 1982). Plaintiff has not pursued any argument in favor of applying this exception.

Plaintiff has argued, however, that the public franchise (or non-delegable duties) exception does apply in this case. Plaintiff argues that "[b]ecause the interstate and intra state transportation of freight is subject to franchise by both federal and state authorities" many decisions have applied this exception to motor carriers who lease independent trucks and truck drivers. However, Plaintiff is unable to cite any Ohio cases in support of this proposition. Even

-9-

if Ohio law supported this position, the exception would not apply because Spring Hill is not a

motor carrier. Plaintiff has cited no law to support a finding that a company that designs delivery

routes (and is not subject to any franchise by federal or state authorities) and who hires an

independent contractor (who is subject to federal and state franchises) to provide motor carrier

services, can be held liable for the actions of the driver leased by the independent contractor.

In Ohio, the public franchise exception states that "where such an operation may be

carried out only by permission given by public authority, the relationship cannot be created for

the purpose of escaping liability for harm to others which would otherwise attach." May v.

Pardee, 165 Ohio St. 126, 129 (1956). Therefore, under Ohio law, a party that can operate only

by a permit, license or other public franchise, cannot escape liability by hiring an independent

contractor to perform the franchised duties in its place. This exception does not apply in the

present case.

Spring Hill did not provide the permit under which the truck at issue in this case was

operating. Spring Hill is not a motor carrier, rather it is a broker. The FMCSR defines a broker

as follows:

> The term "broker" means a person, other than a motor carrier or an employee or
> agent of a motor carrier, that as a principal or agent sells, offers for sale,
> negotiates for, or holds itself out by solicitation, advertisement, or otherwise as
> selling, providing, or arranging for, transportation by motor carrier for
> compensation.

49 U.S.C. § 13102(2). Brokers are not required to have DOT or STB certificates in order to

broker transportation services. Therefore, Spring Hill's operations may be carried out without

permission given by public authority, and the Ohio public franchise exception to independent

contractor liability does not apply.

-10-

### 3. Agency by estoppel

There is absolutely no evidence on the record that would support a finding of agency by estoppel, and there is no argument made by either party relating to agency by estoppel. Therefore, this theory cannot, in this case, support any exception to the general rule that an employer is not liable for the negligent acts of independent contractors. Further Plaintiff has acknowledged that there is no basis for *respondeat superior* liability in this case. (Memo. In Opp. at 15).

The Plaintiff also cites an exception to the independent contractor rule that has been followed in West Virginia; this being that an independent party may be liable for the acts of another party if the other party: (1) caused unlawful conduct or activity by the independent contractor; (2) knows of and sanctions the illegal conduct or activity by the independent contractor; or (3) such unlawful conduct or activity is a proximate cause of an injury or harm. See Shaffer v. Acme Limestone Co., Inc., 524 S.E.2d 688, 701 (W. Va. App. Ct. 1999). There is no indication that the Ohio courts have recognized these exceptions to the independent contractor rule. As a federal court sitting on a diversity case, this Court is bound to follow Ohio law and is not at liberty to adopt new exceptions to well settled rules set by the Ohio Supreme Court. Ohio recognizes only three exceptions to the independent contractor rule at present; each of those exceptions has been examined above and found to be inapplicable in the present case.[4]

---

[4]     It should also be noted, that there is no evidence in the record that would support the Plaintiff's arguments even under the West Virginia exceptions. Spring Hill did not cause Mr. Ashford to drive while fatigued; Spring Hill had no way of knowing that Mr. Ashford was driving while fatigued; and Mr. Ashford had several other sanctioned options that would have prevented the accident without compromising the delivery schedule set by Spring Hill (including waking Mr. Mobley in order to switch drivers, resting, and calling his dispatch to tell them he was too tired to drive and seeking permission for a late arrival).

## B. Negligent or Reckless Design and Procedures

### 1. Safety of the Route

The only evidence Plaintiff presents in support of its claim that the Route240E did not allow for sufficient travel time to ensure the safety of other motorists is a statement by Mr. Mobley that he had heard other drivers had been late. This is not admissible evidence. Mr. Mobley testified at his deposition that the shift foreman at the parts company in Cleveland had told him that other guys had been late arriving at this stop of the route. (Mobley Depo. at 50). This evidence, however, is hearsay.

Both Mr. Mobley and Mr. Ashford testified that the route design provided them with sufficient time to make the trip. (Ashford Depo. at 47-48, 108; Mobley Depo. at 48-50). In fact, at the time of the accident they were running on time despite having left an hour late, and having made at least two stops for gas and breaks. (Ashford Depo. at 68-70, 80, 109; Mobley Depo. at 101). Chieftain representatives also testified that the route allowed plenty of time for a driver to make the trip safely, even accounting for driver breaks and other circumstances. (Ross Depo. at 22; Johnston Depo. at 99-100).

There is no evidence that Chieftain or Spring Hill had ever received any complaints that the route was too difficult to execute in the allotted time. (Johnston Depo. at 100; Appleton Depo. at 129). There is no testimony offered from anyone at the parts company in Cleveland indicating that drivers had been late. There is no testimony offered from any driver indicating that they were late or that they had difficulty making the trip in the time allotted. Even if there were first hand testimony that other drivers had been late, there is no evidence that the driver's tardiness was a result of the route design and not the fault of the driver for starting late or taking

-12-

excessive breaks or detouring from their work.

There is absolutely no direct evidence that the route designed by Spring Hill failed to allow a reasonable time for completion. The only evidence Plaintiff has submitted to show negligence in the design of the route is clearly hearsay. "Hearsay evidence cannot be considered on a motion for summary judgment." FED. R. CIV. P. 56(e). Therefore, there is no admissible evidence to support Plaintiff's claim and summary judgment in favor of the Defendant is warranted on this issue.

### 2. Failure to Communicate the Additional Time Buffer

Plaintiff claims that Spring Hill not only owed Plaintiffs a duty to design a safe route, but "to also communicate that route as safely designed to the drivers." (Memo. in Opp. at 21). Plaintiff claims that instead, Spring Hill communicated a much shorter time allowance on the route than was actually provided, and that this shorter time allowance "pressured the drivers to take unnecessary risks . . . ." (Id.). The only evidence Plaintiff has submitted that would suggest that drivers felt pressured to take unnecessary risks was the following deposition testimony of Mr. Ashford:

> Q.   What are you supposed to do as a professional driver when you are tired?
> A.   You are supposed to pull over and rest.
> Q.   You were already pulled over; right?
> A.   Correct.
> Q.   What was forcing you to go on?
> A.   Being there at eight o'clock.
> Q.   You had to make that eight o'clock time?
> A.   Correct.
> Q.   What happens if you don't – who was saying you got to make that eight o'clock time?
> A.   The company. That's how you get the contract.
> Q.   Chieftain?
> A.   Yes.

-13-

Q.    What happens if you don't make the time?

A.    I guess after being late so many times they lose the contract.

(Ashford Depo. at 75-76). This exchange does suggest that Mr. Ashford was aware of the

importance of being on time. It does not suggest that he was unduly pressured to arrive on time

at the expense of safety. In fact, all other testimony presented in this case indicates that Mr.

Ashford although trying to meet his deadline did not feel pressured (Ashford Depo. at 47-48; 92);

Mr. Ashford knew he was supposed to rest if he was tired (Ashford Depo. at 66, 75, 99); neither

Chieftain nor ProDrivers ever pressured drivers to continue if they were tired (Grahl Depo. at 37-

38; Johnston Depo. at 33); Chieftain knew there were time buffers built into the schedule (Ross

Depo. at 22); there were no penalties for drivers who were late as long as they informed dispatch

of the reason (Mobley Depo. at 53-54); and on this particular run, Chieftain never contacted

them because they were running behind schedule. (Mobely Depo. at 85; Ashford Dep. at 107).

Plaintiff states in his Memorandum in Opposition that on this trip the drivers were under

pressure to meet the 8:00 arrival in Cleveland and that the dispatcher buzzed them each time the

satellite system showed them as running behind schedule. This is contrary to the deposition

testimony of Mr. Mobley and Mr. Ashford, and is not supported by the citations provided by the

Plaintiff. Plaintiff also offers the opinion of his purported expert stating that

> "[t]here is no indication that Robert Ashford understood or knew about it [i.e. that
> "just in time" related to when Saturn was ready to use the parts]. If he would
> have, he would have known that he could have stayed at the rest stop where he
> splashed water upon his face and taken a short nap. He could have refreshed
> himself sufficiently to arrive at Anchor Tool and Die. And he would not have
> fallen asleep at the wheel and caused the accident involved in this suit."

(Daecher Report at 4). This is not appropriate expert testimony. First of all Mr. Daecher has

-14-

offered no qualifications related to the design of routes, or the acceptable standards for creating "just in time" delivery schedules. Second this opinion constitutes pure speculation and is not based on any scientific, technical or other specialized knowledge as required under Fed. R. Evid. 702. There is no way Mr. Daecher could possibly know whether Mr. Ashford would have continued driving even if he'd known his final delivery back in Tennessee was not due in until later than his schedule indicated. Even if the parts weren't due back to Saturn until hours after the final drop off time, the truck was still scheduled to arrive in Cleveland at 8:00 a.m. and the parts supplier there was expecting an on-time arrival. Third, regardless of whether there was extra time built into the route, the evidence is clear that Mr. Ashford knew he could and should have either rested or woken Mr. Mobley if he felt tired, and that he had time to do so without being late for the drop off. Therefore, the lack of communication with regard to the schedule was not the cause of his falling asleep at the wheel.

As set forth above, there is no evidence that the route, as communicated to the drivers was unsafe, or that the drivers felt pressure to take unnecessary risks.[5] Further, even if the route had a time buffer built in for the final delivery to Saturn, there were still legitimate deadlines for finishing each leg of the trip. The supplier in Cleveland was expecting the drivers to arrive at 8:00 a.m.. There is no evidence of a time buffer built in to this leg of the trip. In fact, Mr. Mobley testified that the Cleveland supplier would be negatively affected if the drivers don't

---

[5] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Copeland v. Machulis, 57 F.3d 476, 479 (6th Cir. 1995) (citing Anderson, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. Anderson, 477 U.S. at 249-50 (citations omitted). At most, the testimony cited by Plaintiff in support of his contention that Mr. Ashford felt unduly pressured to meet his deadline would constitute a mere scintilla of evidence insufficient to create a jury question on this issue.

arrive at their scheduled time. (Mobley Depo. at 51).

It is irrelevant that Spring Hill, unbeknownst to the drivers, built in an additional time buffer for final delivery to Saturn in order to protect itself and its clients in the case of unforseen circumstances which could delay the final delivery. Spring Hill owed no general duty to the public to inform its drivers of the additional buffer as long as the schedule the drivers were given provided them a reasonable amount of time to complete the route. In addition, there is no evidence that the failure to communicate this time buffer to the drivers was the cause of this most unfortunate tragedy.

### 3. Performance Evaluations

The Plaintiff also argues that Spring Hill was negligent because it did not count a delivery as late unless the final delivery to Saturn occurred after the time Saturn actually needed the part. In other words, Plaintiff argues that Spring Hill had a duty to track each leg of each route and to base its evaluation on whether drivers were able to meet their arrival time for each stop on the route. It bases this alleged duty on the contract between Spring Hill and Chieftain. There is no privity of contract between Spring Hill and the Plaintiff, nor is there any evidence or theory under which this Court could find that the Plaintiff was a third party beneficiary to the contract between Spring Hill and Chieftain. Therefore, no duty to the Plaintiff can arise from the contract between Spring Hill and Chieftain. Further, even is such a duty did exist under the contract, Ohio law is clear that a tort action cannot arise under the provisions of a contract. Textron Fin. Corp. v. Nationwide Mut. Ins. Co., 115 Ohio App. 3d 137.

Tort actions arise from the breach of duties of conduct imposed by law. The existence of a duty for purpose of a negligence action depends on the foreseeability of the injury. Mussivand

-16-

v. David, 45 Ohio St. 3d 314 (1989). The test for foreseeability is whether a reasonable, prudent person would have anticipated that injury or damage was likely to result in the performance or non-performance of an act. Thomas v. City of Parma, 88 Ohio App. 3d 523 (1993). The question, in this instance, therefore, is whether it was foreseeable to Spring Hill that by performing route evaluations in the manner it did, injury or damage to commuters on the highway was likely to occur.

There is no evidence that Spring Hill had any information which would have led it, or any other reasonable broker or route designer to believe that a particular method of evaluating the performance of its independent contractors on-time deliveries could cause injury or damage to commuters on the highway. Plaintiff has not provided any basis upon which this Court could find that Spring Hill owed a legal duty to the Plaintiffs or to the public in general, to evaluate the performance of its independent contractor in a specific manner.

Further, even if Spring Hill had such a duty, the breach of that duty was not the cause of the accident. This accident was caused by Mr. Ashford and his decision to drive when he was too tired to safely do so. There is absolutely no evidence that the means by which Spring Hill evaluated its provider, or anything else over which Spring Hill had control, had any part in causing this accident. The drivers, unbeknownst to Spring Hill left an hour late; Mr. Ashford knew that he should not have been driving; he was not actually late; neither he nor Chieftain would not have faced any negative employment actions if he had pulled over to sleep or rest; and there was another driver in the truck who could have been woken to take over the driving.

-17-

C. Violations of the Federal Motor Carrier Safety Regulations

Spring Hill cannot be liable for a direct violation of the FMCSR because it is not a motor

carrier and is therefore, not subject to those regulations. Spring Hill is a broker. The FMCSR

defines a broker as follows:

> The term "broker" means a person, other than a motor carrier or an employee or
> agent of a motor carrier, that as a principal or agent sells, offers for sale,
> negotiates for, or holds itself out by solicitation, advertisement, or otherwise as
> selling, providing, or arranging for, transportation by motor carrier for
> compensation.

49 U.S.C. § 13102(2). Chieftain is the motor carrier in this case. Chieftain provides the trucks

and the drivers. Chieftain manages the dispatch and progress of the drivers. Spring Hill is merely

a broker who hires various motor carriers to fulfill the routes it has established. As discussed in

sections above, because Chieftain is an independent contractor, Spring Hill is not vicariously

liable for Chieftain's violations. Plaintiff's Memorandum in Opposition does not address this

claim, therefore, faced with the above information, Plaintiff appears to have conceded that the

FMCSR does not apply to Spring Hill. Summary judgment in favor of the defendant is

warranted on this issue.


D. Punitive Damages

As there is no liability on any of Plaintiff's claims, there is no basis upon which a jury

could award punitive damages in this case.

## Conclusion

The events leading up to this lawsuit were truly tragic. There is simply no evidence that this Defendant was responsible for or contributed to the cause of the accident.  For the reasons set forth above, Defendant's motion for summary judgment is hereby GRANTED, and this case is dismissed with prejudice, each party to bear its own costs.

IT IS SO ORDERED.

*Donald C. Nugent*

DONALD C. NUGENT
United States District Judge

DATED: *October 6, 2005*

-19-